### In re ATLANTIC FINANCIAL MANAGEMENT, INC. SECURITIES LITIGATION.

#### M.D.L. No. 584.

United States District Court,
D. Massachusetts.

Dec. 13, 1988.
Memorandum and Order on Fairness of Becker Settlement and Contribution Bar Feb. 22, 1989.

Peter J. Schneider, Robert J. Cordy and Nancy L. Brush, Burns & Levinson, Boston, Mass., for plaintiffs.

Henry F. Minnerop and Judith Welcom, Brown & Wood, New York City, for Becker Paribas, Inc. in Margaret Hall I.

Alvin K. Hellerstein and Alan M. Klinger, Stroock & Stroock & Lavan, New York City, and Jerome Gotkin, Gordon P. Katz and Robert L. Kirby, Jr., Widett, Slater & Goldman, P.C., Boston, Mass., for AZL in Margaret Hall II and Abelson.

James L. Ackerman, Sharon S. Tisher and Betsy G. Roberti, Day, Berry & Howard, Boston, Mass., for individual AZL defendants in Margaret Hall II and Strong in Abelson.

## MEMORANDUM ON DEFENDANT BECKER'S MOTION FOR CONTRIBUTION AND INDEMNIFICATION BAR

SKINNER, District Judge.

Becker Paribas, Inc. ("Becker"), a defendant in *Margaret Hall Foundation, et al. v. Atlantic Financial Management, Inc.,*

*et al.* ("*Margaret Hall I*") has reached a partial settlement agreement with the plaintiffs, the Margaret Hall class. The agreement is conditioned on the entry of an order by this court barring any claims for contribution or indemnification against Becker arising out of liability of other defendants to class members from the transactions involved in these consolidated actions. Becker now moves for the entry of such an order. Because my decision could affect the right of the class to recover from the remaining defendants, I have dealt with it before conducting a hearing to approve the proposed settlement under Fed.R.Civ. Pro. 23(e).

The facts and procedural history of this litigation are set out in prior orders of the court. *See e.g.* Memorandum and Order on AZL Defendants' Motion for Summary Judgment, dated December 8, 1988. 718 F.Supp. 1003 (Mass.1988). I will not repeat them here.

The plaintiffs in the actions involving Becker ("The *Margaret Hall* class") are former investment clients of Atlantic Financial Management, Inc. ("AFM") who lost money through AFM's investments on their behalf in stock of AZL Resources, Inc. ("AZL") in 1981–82. Becker acted as a clearing broker for TDD, AFM's broker affiliate, in some of these transactions. The plaintiffs allege violations of federal securities law and other federal and state laws in connection with the investments in AZL by two basic groups of defendants. In *Margaret Hall I*, in addition to Becker, the defendants are AFM, TDD and their three principals ("The AFM defendants"). In *Margaret Hall II*, the class sued AZL and certain of its officers and directors ("the AZL defendants").

The Margaret Hall class has reached a partial settlement agreement, under which Becker would be released from liability to the class in exchange for its contribution of $1.3 million to a settlement fund for the benefit of the class. This agreement is subject to this court's approval of the settlement pursuant to Fed.R.Civ.P. 23(e). In addition to the extinguishment of the plaintiff's claims against Becker, the settlement is conditioned upon entry of an order insulating Becker from any claims for contribution or indemnification which might be asserted against it based upon liability to the *Margaret Hall* class.

Plaintiffs have not made any specific proposal to the court as to the setoff to which nonsettling defendants would be entitled against any judgment rendered against them by virtue of the partial settlement. In their proposed notice to the class, however, they represent that they will argue that there should either be no setoff, or that any setoff should be limited to the amount of the settlement figure. Becker, on the other hand, concedes the remaining defendants their right to a setoff, and is indifferent to its amount.

The AZL defendants oppose the proposed settlement and contribution bar, on the grounds that the $1.3 million settlement figure is inadequate, and any setoff in that amount would be unfair to them. In the alternative, they seek to have the amount of the set-off fixed on the basis of Becker's relative fault, to be determined at trial. They also seek a hearing into the fairness of the proposed settlement, again on the theory that because it affects their own liability, they have a right to have its fairness adjudicated.

My decision as to the amount of setoff against an eventual judgment will affect the desirability of the proposed partial settlement, and must be considered by the class and its representatives before the settlement can be approved pursuant to Rule 23(e). I have therefore attempted to resolve this issue before considering the merits of the settlement or authorizing notice to the class, in order that its import may be included in the notice.

## A. *Indemnification*

 In addition to an order barring contribution claims against it, Becker seeks to bar indemnification claims. I am aware of no principle by which I can extinguish the indemnification rights of third parties on the basis of settlement with a joint tortfeasor. *See e.g. Donovan v. Robbins,* 752 F.2d 1170, 1178 (7th Cir.1985) (an

ERISA action for breach of fiduciary duty). The indemnification bar does not appear to be a serious issue in this case, since the liability of no other party to these actions is alleged to have derived solely from Becker's conduct. Indemnification only applies when the liability of the defendant seeking it is not based on his own acts or omissions. *See e.g. Kennedy v. Josephthal & Co.* [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,204, 1983 WL 1314 (D.Mass. May 9, 1983). In any event, there is no right to indemnification as to the federal securities law claims, since to permit violators to obtain total reimbursement of judgments against them would frustrate the federal policy to deter securities fraud. *See e.g. Tucker v. Arthur Andersen & Co.,* 646 F.2d 721, 724 (2d Cir.1981); *In re Nucorp Energy Securities Litigation,* 661 F.Supp. 1403, 1406–07 (S.D.Cal.1987); *Kilmartin v. H.C. Wainwright & Co.,* 637 F.Supp. 938, 940 (D.Mass.1986); *Kennedy v. Josephthal, supra; Globus, Inc. v. Law Research Service, Inc.,* 318 F.Supp. 955 (S.D.N.Y.1970), *aff'd* 442 F.2d 1346 (2d Cir. 1971), *cert. denied sub nom.,* 404 U.S. 941, 92 S.Ct. 286, 30 L.Ed.2d 254 (1971).

### B. Contribution Bar as to State Law Claims

 As to those claims which are based on state law, M.G.L., ch. 231B governs the parties' contribution rights. *See e.g. McIsaac v. Didriksen Fishing Corp.,* 809 F.2d 129 (1st Cir.1987); *Sullivan v. Bankhead Enterprises,* 108 F.R.D. 378 (D.Mass.1985). *See also Simonsen v. Barlo Plastics Co.,* 551 F.2d 469 (1st Cir.1977) (applying NH settlement bar on contribution). Under chapter 231B, § 4, a partial settlement agreement reached in good faith reduces the plaintiffs claims against other tortfeasors in the amount of the settlement figure, and discharges the settling tortfeasor from liability for contribution to any other tortfeasor. M.G.L., ch. 231B, § 4. So long as the settlement agreement was reached before final judgment, it bars contribution claims against the settling party. *McIsaac v. Didriksen Fishing Corporation,* 809 F.2d 129 (1st Cir.1987). For the contribution bar to be operative, the agreement releasing the settling tortfeasor from liability must have been in good faith. *See e.g. Sullivan v. Bankhead Enterprises, Inc.,* 108 F.R.D. 378 (D.Mass.1985). Absent a showing of bad faith, i.e. if the settlement figure were so inadequate as to suggest collusion, or the parties' dealings were not at arms length, it is not necessary that the settlement figure equal the settling defendant's ultimate relative share of liability determined after trial for the bar to operate. The nonsettling defendants are only entitled to a credit against any ultimate judgment in the amount of the settlement, not a credit based on the settling defendant's proportionate share of liability as determined at trial. M.G.L., ch. 231B, § 4.

### C. Contribution Bar for Federal Securities Claims

There is no question that other federal courts have issued contribution bar orders similar to that sought by Becker in this action. The issues are whether one should be imposed in this case, and, if the answer is in the affirmative, what the measure should be of any credit given to nonsettling defendants in the event that judgment is entered against them.

#### 1. Propriety of Bar Order

It is well established that there is a right to contribution for parties jointly liable for violating Section 10(b) and Rule 10b–5. *Tucker v. Arthur Andersen & Co.,* 646 F.2d 721, 724–25 (2d Cir.1981); *Kilmartin v. H.C. Wainwright & Co.,* 637 F.Supp. 938, 940 (D.Mass.1986); *Smith v. Mulvaney,* 827 F.2d 558, 560 (9th Cir.1987); *Heizer Corp. v. Ross,* 601 F.2d 330 (7th Cir. 1979); *Huddleston v. Herman & MacLean,* 640 F.2d 534, 558 (5th Cir.1981), *aff'd in part and rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *In re National Student Marketing Litigation,* 517 F.Supp. 1345 (D.D.C.1981). A right to contribution was adopted by federal courts for the same reason that one to indemnification was re-

jected: to further the federal policy to deter violations of the securities laws by spreading liability among violators. *In re Nucorp Securities Litigation*, 661 F.Supp. 1403, 1406 (S.D.Cal.1987).

The problem with contribution is that, in multi-defendant actions, it removes the incentive to settle, since nonsettling defendants may still file claims for contribution against a joint tortfeasor who has been discharged of direct liability through settlement. Preserving a right of contribution as to settling defendants negates the advantage of partial settlement, which, as a practical matter, makes any settlement unlikely.

In short, while contribution promotes the values of deterrence and fairness, it tends to inhibit settlement in multi-defendant actions. *See Nelson v. Bennett*, 662 F.Supp. 1324, 1333 (E.D.Cal.1987). Given the strong federal policy favoring settlement, federal courts recently have explored a middle ground which would spread liability among violators but not deter partial settlement.

The solution to this problem adopted by many states, as part of their statutory schemes regarding contribution among joint tortfeasors, has been to discharge a settling defendant from liability for contribution to other tortfeasors, but also provide nonsettlors with a set-off against any ultimate judgment against them. *See e.g.* Massachusetts General Law, ch. 231B; New York General Obligations Law § 15–108; California Code of Civil Procedure § 877.6. The amount of the set-off is set as either the settlement figure, *e.g.* M.G.L., ch. 231B; Cal.Civ.Pro.Code § 877.6, a portion of the judgment proportionate to the settling defendant's relative fault, or the greater of the two amounts, *e.g.* N.Y. G.O.L. § 15–108. In any event, once a good faith settlement has been reached, the settling defendant's liability is discharged, and the amount of the set-off affects only the plaintiffs and nonsettling defendants.

Federal courts in other jurisdictions, notably the Ninth and Second Circuits, recently have adopted contribution bar rules in Rule 10b–5 actions, which discharge the liability of settling parties from claims for contribution by nonsettling defendants. *See e.g. Nelson v. Bennett*, 662 F.Supp. 1324 (E.D.Cal.1987); *First Federal Savings & Loan Association of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 631 F.Supp. 1029 (S.D.N.Y.1986). *See also In re Sunrise Securities Litigation*, 698 F.Supp. 1256 (E.D.Pa.1988). The reason to adopt settlement bar rules, is that they further both strong federal policies of encouraging settlement, by insulating a settling defendant from further indeterminate liability, *See e.g. Donovan v. Robbins*, 752 F.2d 1170, 1177 (7th Cir.1985), and of spreading liability for violations of securities law among violators. The parties concede that there is as yet no authority in this circuit either forbidding or commanding me to employ a contribution bar. For the same reasons relied on by the other federal courts noted, I rule that a contribution bar order is appropriate, and will issue upon entry into a settlement agreement, contingent upon the court's determining the proposed settlement is fair.

2. Federal or State Law

The next issue is whether to employ Massachusetts law or to fashion a uniform federal rule. Both contribution rights under federal securities claims and the effect of a release thereon are governed by federal law. *See e.g. Nelson v. Bennett*, 662 F.Supp. 1324 (E.D.Cal.1987); *First Federal Savings & Loan Association of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 631 F.Supp. 1029, 1034 (S.D.N.Y.1986). In the absence of clear direction by Congress, courts must still decide whether to borrow the substance of the rule from the laws of their respective forum states, or to fashion a uniform federal common law.

Some courts have elected to adopt the settlement bar rules of their forum states in these cases, in order to secure uniformity between the contribution rights under federal securities and state law claims in a single action and vindicate the state's interest in settlement. *See e.g. First Federal Savings & Loan Association, supra.* Even if the cause of action arose in multi-

ple jurisdictions, there need be no disjunction on this point, as the law to be consulted with regard to settlement bars should be the site of the litigation, since the relevant state interest is in the workings of its courts, and not the underlying tort. *See e.g. In re Sunrise Litigation*, 698 F.Supp. 1256 (E.D.Pa.1988) (dealing with state law claims).

Other courts have chosen to fashion a uniform federal rule, to ensure nationwide uniformity and promote settlement even in those states which lack contribution bar statutes. *See e.g. Nelson v. Bennett, supra.* This is not the case here, since Massachusetts does possess such a statute, M.G.L., ch. 231B, § 4. In addition, as the court pointed out in *Bennett*, both state and federal systems share the same strong interest in encouraging settlement. In any event, I need not decide whether to borrow from state law or not, since if I were to fashion a uniform federal rule, it would be consistent with the Massachusetts statute.

### 3. Amount of the Setoff

There are two basic approaches to determining the amount of setoff due nonsettling defendants when a joint tortfeasor has been discharged by settlement and an accompanying contribution bar: the first fixes the amount of the setoff as the amount paid in settlement, the "settlement bar" rule. This has been the approach taken by the courts of the Ninth Circuit. *See Nelson v. Bennett, supra.* The second determines the setoff according to the greater of either the amount of the settlement or the settling defendant's proportional share of liability, as determined at trial. This is the "comparative fault" rule. This method has been employed by the courts of the Second Circuit. *See First Federal Savings & Loan Association, supra. See also* the discussion of the alternative rules in *Donovan v. Robbins*, 752 F.2d 1170, 1177–80 (7th Cir.1985).

Under the "settlement bar" rule, the validity of the settlement and of the contribution bar, which in turn fix the amount of the set-off, turns on a finding that the agreement is fair to both settling and non-settling defendants. The factors which are relevant to this determination include 1) whether a larger judgment against the settling defendants would be collectible; 2) the strength of plaintiffs' liability case against that defendant; 3) the settling defendant's relative culpability; and 4) the participation of a magistrate or judge in the settlement negotiations. *See e.g. Kirkorian v. Borelli*, 695 F.Supp. 446 (N.D. Cal.1988). Since liability in a Rule 10b–5 action is apportioned according to relative culpability, and not pro rata, any inquiry into the fairness of the settlement must deal with the strength of plaintiffs' case against each defendant as to liability and the relative blameworthiness of its conduct. *See e.g. Smith v. Mulvaney*, 827 F.2d 558, 561 (9th Cir.1987). The evidence and factors relevant to a fairness determination are not the same as those considered in a hearing under Rule 23(e). The focus of a Rule 23(e) hearing is whether the proposed settlement is "fair, reasonable, and in the best interests of the class." A fairness hearing, on the other hand, focuses on whether the discharge of the settling defendant at the amount specified would be fair to the nonsettling defendants, who ultimately must pay any deficiency in the judgment. *See e.g. Smith v. Mulvaney, supra.* In *Smith*, a partial settlement was reached which was approved by the court pursuant to Rule 23(e) as fair, reasonable, and in the best interests of the plaintiff class. After judgment was entered for the plaintiffs, one of the nonsettling defendants filed a contribution claim against the settlors. The district court granted the settling defendants' summary judgment motion on the contribution claim, on the basis that the settlement represented the settlor's proper share of liability. The court supported this determination by citing its approval of the settlement under Rule 23(e), the record generated at trial, and the court's own perception that the defendant seeking contribution was significantly more culpable than the settlors. This decision was reversed, and the action remanded for a redetermination of whether the settlement was fair to all defendants. The court's determination that the settlement was fair could not

stand, because the evidence relied on did not adequately support such a finding in that neither a Rule 23(e) hearing nor the trial itself adequately focused on the relative culpability of the settling and nonsettling defendants. *Smith, supra*, 827 F.2d 558, 561–62. Particularly in the absence of substantial participation in settlement negotiations by a magistrate, a fair opportunity for nonsettling defendants to present their views as to the fairness of the settlement is essential for the validity of any contribution bar arrangement in which the amount of the set-off is determined by the settlement figure.

The "comparative fault" rule avoids the need of a pretrial determination of the fairness of the proposed partial settlement, because all interested parties have the opportunity to argue the issue of relative fault at trial. The settling defendant is absent, but has no further stake in the amount of any set-off, because of the contribution bar. The plaintiffs inherit the settlor's interest in minimizing its degree of fault, and can so argue at trial. While using this approach has some appeal because it avoids the need for an additional pretrial hearing, it merely pushes the same issues forward into an already complex and confusing trial. Delaying final determination of the amount of the set-off deprives the plaintiff class of one of the chief inducements to settle: certainty. Particularly in class actions, this method generates significant practical difficulties as well, in that the indeterminate impact of any partial settlement would make it difficult to frame a notice to the class which fairly presents the merits of the proposed settlement. Furthermore, in complex securities litigation, the burden on the jury's time and perception is already considerable. To add to this burden the task of apportioning fault between absent and present defendants would obviate much of the advantage of partial settlement to the judicial system itself.

■ On balance, I find that the "settlement bar" rule with a pretrial determination of the fairness of the settlement is the better alternative. The advantages of the "settlement bar" approach are basically that the impact of any settlement will be clear to all when approved, the trial will be made less, not more complex by pretrial resolution of the set-off figure, and there will be no disjunction between contribution rights as to the state and federal law claims.

In order to allow sufficient time for a determination of the fairness of the proposed settlement, and for notice to the class should the settlement be found to be fair, the trial of defendant Becker is hereby severed from the rest of these consolidated actions and stayed pending resolution of settlement issues. Both the Margaret Hall class and Becker have waived their rights to jury trial. Should trial become necessary, it will be before the court, in order that I may take notice of the record of the trial of the main action and avoid duplication of evidence from the main action.

Accordingly, defendant Becker's motion for a contribution bar effective upon its entry into a settlement with the class will be allowed, contingent on a determination by the court that the proposed settlement is fair. In this event, the amount of any set-off against a judgment obtained by these plaintiffs in the main action will be in the amount of the settlement figure. At the pre-trial conference on December 12, 1988, the following schedule was established: Oppositions contesting the fairness of the proposed partial settlement, in the form of affidavits and other documentary evidence, were to be filed and served no later than February 13, 1989. Responses were due February 27, 1989. This scheduling order is vacated because it may result in the eventual Rule 23(e) hearing occurring after the trial is over and the verdict has been returned. Accordingly, a further scheduling conference will be required.

### MEMORANDUM AND ORDER ON FAIRNESS OF BECKER SETTLEMENT AND CONTRIBUTION BAR

Becker Paribas, Inc. ("Becker"), a defendant in the action styled *Margaret Hall I*, has reached a settlement agreement with the plaintiff class. The agreement was

conditioned on the entry of an order barring any claims by nonsettling defendants for contribution against Becker based on liability to class members arising out of the transactions which underly these actions. In my memorandum of December 13, 1988 I allowed the motion for a contribution bar, subject to a determination that the settlement was negotiated in good faith and fair to nonsettling defendants. The nonsettling defendants would be entitled to a set-off in the amount of the settlement figure against any judgment the class obtains against them.

■ I invited submissions from the parties regarding the fairness of the proposed settlement. Strong and AZL ("the defendants") oppose the settlement on the grounds that the $1.3 million settlement figure is inadequate in light of Becker's relative culpability and the strength of the case establishing its liability.[1] The parties submitted affidavits in support of their positions. Defendants submitted affidavits of James H. Lynch, and Becker submitted the affidavit of Benjamin L. Lubin. Oral argument was held on the fairness issue on February 13, 1989. On the basis of these submissions and arguments, and for the following reasons, I determined that the proposed settlement was adequate, and allowed the motion for a contribution bar, contingent on confirmation of the settlement pursuant to Rule 23(e). I announced my decision February 14, 1989. The basis for my decision is set out in this memorandum.

### Terms of the Settlement

The settlement agreement provides that Becker pay $1.3 million to plaintiffs' counsel for the benefit of the class. This would be the amount of any set-off to which nonsettling defendants would be entitled should plaintiffs secure a judgment against them.

Although only a portion of the transactions in AZL were cleared through Becker, the settlement has been negotiated to embrace the entire class. The extension of the benefits of the settlement beyond claimants whose transactions were cleared through Becker reflects a modification of plaintiffs' theory of liability. Initially, Becker was allegedly liable by virtue of its status as a clearing broker, and solely to those class members in whose transactions it was involved. Plaintiffs currently consider their most viable theory to be that Becker is liable as an aider and abettor of the primary Rule 10b–5 violations by the other defendants, and not by virtue of its status as clearing broker. As such, Becker's liability, and the disbursement of the settlement proceeds would be to the entire class, and not merely to the subclass whose transactions in AZL were actually cleared through Becker. I certified such a subclass on July 30, 1987, in my order certifying the Margaret Hall class. The parties originally planned to accomplish this result by the awkward mechanism of creating a second subclass. In my opinion, this will create unnecessary complications. The proper method is to vacate the order creating the subclass, which I will do upon presentation of a proper motion.

### State Law Claims

■ No fairness adjudication is necessary to extinguish nonsettling defendants' rights as to the state law claims. Massachusetts General Law, c. 231B, § 4 provides that so long as a settlement was in good faith and was reached before entry of judgment, the settling defendant is thereby discharged from liability to any other tortfeasor. *See e.g. McIsaac v. Didriksen Fishing Corporation,* 809 F.2d 129 (1st Cir.1987); *Sullivan v. Bankhead Enterprises, Inc.,* 108 F.R.D. 378 (D.Mass.1985); *Bishop v. Klein,* 402 N.E.2d 1365 (Mass. 1980); *Boston Edison Co. v. Tritsch,* 346

---

1. The individual AZL defendants, Melsheimer, Spangler and Hentsch join in opposing the settlement and contribution bar. Their liability, if any, is for insider trading, and is wholly unrelated to any potential liability of Becker. They would not be entitled to seek contribution

from Becker, and will not be entitled to any set-off on the basis of the settlement. Therefore, they are unaffected by the proposed bar order and lack standing to oppose the settlement.

N.E.2d 901 (Mass.1976). Unless the settlement figure is so grossly inadequate as to demonstrate that the agreement was not arrived at in good faith, the court need not pass judgment on the adequacy of the settlement figure.

I have seen no evidence of bad faith or collusion on the part of counsel for plaintiffs or Becker. Defendants have advanced no support for their suggestion that plaintiffs engineered a "sweetheart deal" in order to unfairly saddle them with the lion's share of an eventual judgment, or rushed to settlement to finance their litigation as to the remaining defendants. This agreement was reached after extensive discovery had been conducted, and less than two months before trial was to commence. It is highly unlikely that any settlement funds will be available to the plaintiffs or their counsel before conclusion of the trial as to the remaining defendants. The settlement figure was substantial. The plaintiffs have admitted that they would have significant problems establishing Becker's liability. Were this not the case, they would have every incentive to litigate rather than settle, since, as all parties acknowledge, Becker has sufficient resources to satisfy a much larger judgment. There is no evidence that plaintiffs had any motivation to settle other than the obvious and proper one—the risk that Becker might be absolved from liability at trial.

### Damages Attributable to Becker

Plaintiffs currently estimate the damages over the entire class period as roughly $11.2 million, exclusive of pre-judgment interest. Plaintiffs concede, however, that Becker's liability as an aider and abettor would not attach until it had actual knowledge of the primary violations by the other defendants. The earliest point plaintiffs expect to prove that Becker had the requisite scienter for liability under Rule 10b–5 is October 15, 1981, when TDD began to regularly direct Becker to buy AZL near the close of trading, an allegedly improper and manipulative practice. Damages attributable to the period of Becker's potential liability, October 15, 1981–February 9, 1989, are estimated at $5.6 million, exclu-

sive of pre-judgment interest. These figures are based on average damages of $14.00 per share. Plaintiffs point out the possibility of a lower award against Becker of perhaps $12.00 per share, for a total of $4.8 million, because of its relatively low culpability. See, e.g., Smith v. Mulvaney, 827 F.2d 558, 561 (9th Cir.1987). In addition, as the parties acknowledged at the hearing, these figures are likely to be reduced by roughly 10%, due to the exclusion from the class of certain limited partnerships in which Dilanni had an interest. This brings Becker's estimated liability to $4.32 million, exclusive of pre-judgment interest. The settlement amounts to roughly 30% of this figure.

### Relative Culpability

Becker's culpability relative to the nonsettling defendants affects any assessment of the adequacy of the settlement figure, since in a Rule 10b–5 action, liability is not pro rata, but may be apportioned according to relative fault. See e.g. Smith v. Mulvaney, 827 F.2d 558, 561 (9th Cir. 1987). Becker's liability, if any, would be as an aider and abettor. The evidence is scanty that it was actually aware of AFM's alleged market manipulation scheme, or knowingly assisted in its perpetration. The only benefit Becker expected or did from its relationship with TDD was its brokerage fees on the transactions. For all of the TDD accounts cleared through Becker, including entities not included in the class, these fees amounted to $91,756 for October 1981–February 1982, and $180,355 for the entire class period.

In contrast, the nonsettling defendants are charged with primary violations of Rule 10b–5. Should the plaintiffs succeed in establishing their version of the facts, the nonsettling defendants' conduct would evidence culpability substantially greater than Becker's. Strong and, through him, AZL are alleged to have knowingly and intentionally fed false and misleading information into the market through Dilanni, in furtherance of a scheme to artificially inflate the price of the stock. It is further alleged that in reliance on these misrepre-

sentations, Dilanni invested substantially all of plaintiffs' funds which were entrusted to him in AZL, and as a result, their accounts were wiped out. At worst, Becker is accused of insufficient vigilance to prevent the plaintiffs' losses. The remaining defendants are alleged to have affirmatively and intentionally brought about those losses. Given these factors, I find that Becker's relative culpability and thus its likely share of liability would be lower than that of the nonsettling defendants.

### Strength of Liability Case

The most important factor in evaluating the adequacy of settlement, and the primary focus of the parties' arguments, is the strength of proof of liability. "The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits. The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." *In re General Tire and Rubber Co. Securities Litigation,* 726 F.2d 1075, 1086 (6th Cir.1984), *cert. denied,* 469 U.S. 858, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). Should it appear that the plaintiffs are unlikely to succeed in establishing Becker's liability at trial, the arguments that the settlement is fair and adequate become most persuasive.

Plaintiffs have two basic theories of Becker's liability, but acknowledge significant hurdles establishing liability under either one. Their initial theory was based on breach of duties owed by virtue of its status as clearing broker for certain of the plaintiffs' accounts. Under this theory, Becker would be liable only to the subclass of plaintiffs who had an account relationship with it. The class's second, and current theory, is based on Becker's alleged aiding and abetting AFM's market manipulation scheme, in violation of Rule 10b–5. Should plaintiffs succeed on this basis, Becker would be liable to the entire class and not merely to those whose accounts it cleared.

### 1. The Broker Theory

Plaintiffs' initial claims were based on Becker's having breached duties owed its customers by virtue of the brokerage relationship. Specifically, they asserted that Becker had a duty under the "know your customer rule" to recognize that the high concentrations of AZL stock were unsuitable investments for these plaintiffs' accounts, many of which were employee benefit trust funds. Plaintiffs also believed that numerous trades had been executed through Becker which evidenced self-dealing by AFM principals, i.e. large sales of AZL stock by AFM at the same time as it was purchasing the stock for its clients' accounts. They contended that Becker had a duty to examine plaintiffs' accounts and to notify them of the unsuitability of AFM's investments on their behalf, and of these apparent conflicts of interest.

It has become clear, both through discovery and crystallization of applicable law that there are significant legal and factual difficulties in establishing Becker's liability on this basis. Becker had no general duty to plaintiffs to scrutinize their investment portfolios for their suitability. *See e.g. In re Atlantic Financial Management,* 658 F.Supp. 380, 382 (D.Mass.1986). The allocation of functions between introducing brokers and clearing brokers, including the duty to "know your customer", is routine practice in the securities industry, and is specifically authorized by Rules 382 and 405 of the New York Stock Exchange.[2] *See Aff. of Benjamin L. Lubin at pp. 8–12.* The Fully Disclosed Correspondent Agreement between TDD and Becker allocated responsibility to TDD, the introducing broker, to know the essential facts relative to its clients and the transactions effected in their accounts, including the suitability of investments. Becker, the clearing broker, had responsibility for executing

---

**2.** While the amendment to Rule 382 explicitly authorizing contractual allocation of functions between introducing and clearing brokers was approved February 19, 1982, the effect of the amendment was merely to clarify and not to alter the relationship between organizations involved in fully disclosed carrying agreements. *See NYSE Information Memo* 82–18 at 1 (March 5, 1982).

and clearing trades and for mailing confirmations of the trades to TDD's customers. Defendant's expert, Mr. Lynch, avers that Becker had a duty to scrutinize the plaintiffs' accounts for the suitability of their investments, and to prevent Dilanni from accumulating excessive concentrations in them. I am not obliged to rule on this point, but as a preliminary matter it is my observation that Mr. Lubin has the better of the argument.

In addition, plaintiffs currently concede that the TDD trading records which they initially believed evidenced that trades for TDD's own benefit had been executed at the same time, and in conflict with, trades for clients' accounts, now appear to be perfectly proper price averaging. The apparent volume of buying and selling activity through TDD's own account was a reflection of customer transactions being passed through the TDD account by Becker for price averaging purposes and merely represent allocation of each day's trades among TDD client accounts, in order to give a fair average price to each.

## II. Aider and Abettor Liability

Plaintiff's current theory of Becker's liability is that it aided and abetted Dilanni and AFM's primary Rule 10b–5 violations by knowing assisting their scheme to manipulate the price of AZL stock. To establish this, plaintiffs hoped to prove that sometime in the fall of 1981 Becker became aware that TDD and Dilanni were trading in AZL stock in a manner which evidenced market manipulation, and that Becker then knowingly aided and abetted the scheme by concealing their improper activities from the SEC, by continuing to execute AZL trades for AFM client accounts, and by failing to report the manipulative practices when they had a duty to do so.

### a. Manipulative Trading Practices

Plaintiffs recognize that proving that Becker had the requisite scienter to support aiding and abetting liability under Rule 10b–5 would present substantial difficulties at trial. Their proof that Becker was aware of the market manipulation would be wholly circumstantial, as no party can point to any direct evidence that Becker had actual knowledge of Dilanni's plans. The most which defendants opposing the settlement are able to assert is that Becker "closed its eyes to Dilanni's fraud" and "failed to inquire".

A number of assertedly improper trading practices were listed by plaintiffs and by defendants opposing the settlement in support of their claim that Becker was on notice of Dilanni's intentions, and that it substantially assisted his fraud. There are three basic practices of this nature, the interpretation and legitimacy of which the parties' experts have advanced competing views.

The first of these is Becker's practice of executing orders to purchase AZL in the form of multiple small transactions in the course of a day, rather than as a single bulk order. AZL's expert Mr. Lynch maintains that this was designed to generate the false impression of frenetic trading in the stock and thus inflate the price.[3] Becker's expert, Mr. Lubin maintains that this is a standard technique designed to obtain the best overall price for the client, while having the least possible impact on the price of the stock.

Second, TDD often failed to instruct Becker as to how it wished block transactions in stock to be allocated to its individual client accounts until the following day. Becker initially permitted the shares to remain in its trading account overnight, but later required TDD to house them in its own account until allocated to client accounts. Lynch asserts that this demonstrated that TDD was buying stock solely to create "buying pressure in order to ma-

---

**3.** Lynch also makes the assertion that Becker charged increased commissions from placing multiple small trades, rather than one large one. Becker's expert points out that this statement is inaccurate, and that it is industry practice to define an "order" for purposes of figuring commissions on either all purchases or all sales of a particular stock on a daily, rather than a transactional basis. This apparent ignorance of standard practice in the brokerage industry undercuts Mr. Lynch's credibility as to other aspects of his testimony.

nipulate the market", rather than for the benefit of its clients. Lubin's explanation is that it is common and not improper for investment managers handling several discretionary accounts to wait until after the close of trading, and sometimes overnight, before allocating the transactions among those accounts. Becker explains its requirement that TDD house unallocated stock in its own trading account, rather than Becker's as due to the decision that the financial risk of carrying the stock should be TDD's and not Becker's. A trier of fact might well accept Lubin's and Becker's view.

Finally, TDD began to time its orders for the close of trading, an allegedly manipulative practice. On 18 of the 22 trading days in October of 1981, TDD directed Becker to execute orders in AZL near the end of the trading day. This practice was allegedly designed to give an incremental boost to the closing price of the stock, which is the price reported in the financial press. While I believe that this practice may evidence a manipulative intent by TDD, it is far from certain that the factfinder would determine that it was sufficient to make Becker aware of the fraud, particularly in light of evidence that the American Stock Exchange examined trading in AZL over the period September 21, 1981–November 13, 1981 and concluded that there were no irregularities.

b. *The AMEX Investigation*

On November 13, 1981, Dilanni placed an order to sell 30,000 shares of AZL. Dilanni admits that his intent was not to actually execute the sale, but to create a trading imbalance in the stock so that the authorities would order a temporary halt to trading. The sell order was never executed.

The American Stock Exchange ("AMEX") conducted an examination into trading in AZL for the period September 21, 1981–November 13, 1981. Pursuant to this investigation, AMEX requested that Becker supply specified information about any accounts which sold AZL stock on November 13, 1981. Although Becker complied with the request for information, de-

fendants accuse it of having "stonewalled" AMEX by not volunteering information about the aborted 30,000 share sell order. The assertion that Becker concealed or failed to provide information it had a duty to supply has very little support. The Exchange was fully aware that the sell order was placed, and that its source was Becker. This fact was included in the AMEX report of its examination of trading in AZL shares. The information sought from Becker was limited to sales which were actually executed. Had AMEX wished additional information about the sell order, it knew where to seek it.

Defendants' only other basis for charging Becker with guilty complicity in the activities of AFM and Dilanni is that it "knowingly became overly involved" with them, by leasing office space and telephone facilities to AFM, and by sponsoring a promotional lunch held to introduce AZL to the Boston investment community in May of 1981.

In summary, I find that Becker's culpability is relatively low and the difficulties of establishing its liability would be substantial. In addition, I find that the proposed partial settlement agreement is a good faith settlement, and that in light of these factors, the settlement figure is adequate and fair to nonsettling defendants.