CORTEC INDUSTRIES, INC. and Cortec Holdings, Inc., Plaintiffs,

v.

SUM HOLDING L.P., Dubin Clark & Company, Inc., Dubin Clark Capital Corp., Ronald N. Dubin, J. Thomas Clark, Jean–Pierre Dammann, Norman J. Yerke, Michael Canipe, Bowles Hollowell Conner & Co., and Ernst & Young, Defendants,

v.

LEACH McMICKING & CO. LIMITED PARTNERSHIP, Leach McMicking & Co., Howard Leach, Lawrence Chamberlain, Martha Fray and Henry McMicking, Additional Counterclaim Defendant.

No. 90 Civ. 0165 (CSH).

United States District Court, S.D. New York.

Dec. 10, 1993.

Sonnenshein Nath & Rosenthal, New York City (Michael H. Barr, Gregory S. Karawan, of counsel), for plaintiffs and additional counterclaim defendants.

Bingham Dana & Gould, Boston, MA (Daniel L. Goldberg, Victor H. Polk, Jr., Jeffrey Marlin, of counsel), for defendants Ronald Dubin, J. Thomas Clark, Jean–Pierre Dammann, Sum Holding, L.P., Dubin Clark. & Co., Inc., Dubin Clark Capital Corp., Norman J. Yerke and Michael Canipe.

Robinson, Bradshaw & Hinson, P.A., Charlotte, NC (Mark W. Merritt, Richard B. Whisnant, of counsel), Richards Spears Kibbe & Orbe, New York City (Lee S. Richards, of counsel), for defendant Bowles Hollowell Connier & Co.

Alan A. Harley, Asst. Gen. Counsel, New York City (John Matson, Bruce M. Cormier, Melanie T. Morris, of counsel), for defendant Ernst & Young.

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In this securities fraud case with pendent state and common law claims, plaintiffs and certain defendants move the Court for an order approving a settlement which *inter alia* would bar claims by the nonsettling defendant against the settling defendants. The nonsettling defendant objects to the proposed settlement, including the bar order, as unfair.

### I.

The facts are stated in this Court's opinion dated January 3, 1991, the Second Circuit's opinion reported at 949 F.2d 42 (2d Cir.1991), and this Court's memorandum dated March 22, 1993. I assume familiarity with those writings and describe herein only those facts necessary to provide an understanding of the present issue and its resolution.

Cortec Industries, Inc. is engaged in the business of manufacturing pre-engineered metal buildings. On May 12, 1989 plaintiffs purchased all of Cortec's stock and its outstanding debt for $53 million. Plaintiffs are "new" Cortec Industries, Inc. and Cortec Holdings, Inc., which were formed to implement the transaction. Prior to the transaction "old" Cortec was held by four different categories of owners: defendants, corporate and individual, affiliated with Dubin Clark & Company, Inc., which had formed old Cortec; individual defendants who were members of old Cortec's management; Woodlawn Foundation, a not-for-profit corporation which owned some old Cortec shares; and Westinghouse. Credit Corporation, holder of a warrant to purchase shares of old Cortec.

In addition to these defendants, plaintiffs' original complaint named as defendants Bowles Hollowell Connor & Co., an investment banking firm retained by the Dubin Clark and management defendants to assist them in selling old Cortec; and the accounting firm of Ernst & Young, old Cortec's outside auditors and accountants, which plaintiffs also retained to give a "comfort letter" with respect to Cortec's March 1989 financial statements as a condition precedent to plaintiff going through with the purchase. At the pertinent times Ernst & Young was known by the name of its predecessor firm, Arthur Young. I will refer to the accounting firm by its present name, Ernst & Young, throughout this opinion.

The thrust of plaintiffs' federal securities charges was that the defendants, in various ways and at various times, by fraudulent misrepresentations or failures to disclose, misled plaintiffs with respect to the financial stability and prospects of old Cortec.

All defendants moved on various grounds to dismiss the original complaint. In this Court's opinion dated January 3, 1991, I granted those motions in part and denied them in part. With respect to the claims that were dismissed, I granted leave to replead in some instances but denied leave in others.

Plaintiffs had sued Westinghouse Credit Corporation for violating § 12(2) of the 1933 Securities Act. I dismissed that claim with-

out leave to replead. In its opinion reported at 949 F.2d 42, the Second Circuit reversed and held that leave should have been granted plaintiffs to replead their § 12(2) claim against Westinghouse as a solicitor of the old Cortec sale.

Thereafter plaintiff filed their first amended complaint (hereinafter the "complaint"). Plaintiffs did not replead their § 12(2) claim against Westinghouse. Certain other individual defendants were dropped from the case. The remaining defendants are Sum Holding, L.P., Dubin Clark & Company, Inc., Dubin Clark Capital Corp., Ronald N. Dubin, J. Thomas Clark, and Jean–Pierre Dammann, all affiliated with Dubin Clark; Norman J. Yerke and Michael Canipe, former officers of old Cortec; Bowles Hollowell Connor & Co., the investment banking firm; and Ernst & Young, the accounting firm.

Plaintiffs have entered into a proposed settlement with all defendants except Ernst & Young. Under the settlement and the order and judgment I am asked to sign in order to implement it, the settling defendants will pay to plaintiffs the total sum of $4,250,000. Ernst & Young, as nonsettling defendant, will be entitled to a $4,250,000 reduction in the amount of any damages ultimately awarded to plaintiffs against Ernst & Young. The order implementing the settlement also provides:

> ... it is further
>
> ORDERED, that all claims for contribution, indemnity or otherwise against Sum Holding, L.P., Dubin Clark & Co., Inc., Dubin Clark Capital Corp., Ronald N. Dubin, J. Thomas Clark, Jean–Pierre Dammann, Norman J. Yerke, Michael Canipe and Bowles Hollowell Conner & Co. (the "Settling Defendants") that have been or could have been asserted by Ernst & Young (the "Non–Settling Defendant"), whether under the federal securities laws, state laws or common law, arising out of (i) the matters which are or could have been alleged in the First Amended Complaint in this Litigation; or (ii) the purchase and sale of Cortec Industries, Inc. ("Cortec") on May 12, 1989, are hereby extinguished, discharged and barred;, and it is further

> ORDERED, that the Non–Settling Defendant is permanently barred and enjoined from instituting, prosecuting or continuing to prosecute, either directly, representatively or in any other capacity, any action against the Settling Defendants to the extent such action asserts any claim, demand, right or cause of action, on whatsoever theory, arising out of (i) the matters which are or could have been alleged in the First Amended Complaint in this Litigation; or (ii) the purchase and sale of Cortec on May 12, 1989; ..."

Ernst & Young contends that the proposed settlement and accompanying bar order are unfair to it because Ernst & Young is not adequately compensated for the loss of its barred claims against the settling defendants.

## II.

The fairness of a bar order in cases of partial settlement was most recently considered by the Second Circuit in *In re Masters Mates & Pilots Pension Plan,* 957 F.2d 1020 (2d Cir.1992) ("*MM & P*").

The Second Circuit observed in *MM & P* that a partial settlement with a bar order requires courts "to weigh the policy favoring settlement of claims by injured plaintiffs against the need to protect the rights of nonsettling defendants." 957 F.2d at 1023. On the particular facts of that case, the Second Circuit concluded "that this settlement is unbalanced, in part because it reflects a misunderstanding of recent case law and in part because the district court gave inadequate consideration to relative culpability before approving the settlement bar." *Id.*

The defects perceived by the Court of Appeals in *MM & P* are separate but related. The nonsettling defendant in *MM & P* objected to the settlement "on the grounds that it unfairly cuts off [his] rights and potentially subjects him to a disproportionate share of liability for the injuries caused the plaintiffs." *Id.* The issue of relative culpability between defendants does not arise in a vacuum. Relative culpability depends upon the application of recent case law to the particular facts of the litigation.

■ To determine whether a settlement bar unfairly cuts off the nonsettling defendant's right to assert claims against the settling defendants, one must first examine the claims asserted by the plaintiffs against the nonsettling defendant, and then evaluate the nonsettling defendant's potential claims against the settling defendants.

While plaintiffs' complaint alleges a considerable variety of fraudulent misrepresentations and omissions against one defendant or another, corporate or individual, the claims against Ernst & Young focus upon two particular aspects of Cortec's financial condition.

First, plaintiffs allege that during 1988 and the first quarter of 1989 Cortec fraudulently understated the amounts of accounts receivable that were doubtful of collection, while reducing bad debt reserves to entirely unreasonable amounts.

Second, plaintiffs allege that during 1988 Cortec violated generally accepted accounting principles ("GAAP") by treating as "accrued" income the value of fabricated product that had been produced but not yet shipped to customers. Plaintiffs contend that GAAP requires that income not be recognized on a company's books until delivery of the product to customers.

The complaint alleges that Ernst & Young was Cortec's outside auditor and accountant for the fiscal years 1986, 1987 and 1988. In March 1989 Ernst & Young issued an unqualified opinion on Cortec's 1988 financial statements, accompanied by a management letter. Plaintiffs allege that Ernst & Young knew or recklessly disregarded Cortec's practice of maintaining unrealistically low reserves for bad debts.

As for the accruals of income based upon goods produced but not yet shipped, which plaintiffs allege Cortec employed as a device to make up for the gap between actual shipments and monthly income projections, plaintiffs allege that in 1988 Ernst & Young insisted that Cortec comply with GAAP, so that the company's year-end 1988 financials reflected no accruals as income. However, plaintiffs allege, Cortec resumed its practice of income accrual during the first quarter of

1989, when negotiations with plaintiffs for the purchase of Cortec were at a sensitive point.

On April 11, 1989, plaintiffs and the Cortec defendants entered into a stock purchase agreement. That agreement contained certain warranties with respect to Cortec's financial condition after January 1, 1989. The stock purchase agreement also provided that Ernst & Young would furnish a comfort letter to plaintiffs concerning the first quarter 1989 Cortec financials. On April 15, 1989 plaintiffs received Cortec's March 1989 financials and the accountants' management letter, which did not disclose Cortec's resumed use of accrual income to bolster sagging sales, or the grossly depleted reserves. On April 9, 1989, Ernst & Young delivered its comfort letter to plaintiffs. That comfort letter did not disclose the material changes in Cortec's financial condition which plaintiffs allege occurred during the first quarter of 1989.

■ Thus plaintiffs charge Ernst & Young with acting with fraudulent knowledge and intent, or reckless disregard of truth, when the accounting firm gave an unqualified opinion and management letter with respect to Cortec's 1988 financial statements, and when it gave plaintiffs a comfort letter with respect to the first quarter 1989 financials.

Relying in part on Ernst & Young's unqualified opinion and its comfort letter, plaintiffs purchased old Cortec, to their subsequent regret. Plaintiffs' first cause of action, against all defendants including Ernst & Young, alleges primary liability under § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5 promulgated thereunder. The second cause of action charges all defendants with aiding and abetting each other's violations of the statute and the rule.

When plaintiffs filed and served their amended complaint, all defendants moved again under Rule 12(b)(6), Fed.R.Civ.P., to dismiss it for legal insufficiency. Those motions were pending when plaintiffs and the settling defendants entered into the proposed settlement. Ernst & Young's motion to dismiss the complaint remains *sub judice.* I consider the issues raised by that motion in the present context, since if plaintiffs have

failed to assert legally viable claims against Ernst & Young, that defendant is entitled to a dismissal at this time, and questions of the fairness of the proposed order barring Ernst & Young's claims against the settling defendants do not arise.

Evaluating plaintiffs' claims against Ernst & Young by the lenient criteria required by Rule 12(b)(6), I conclude that plaintiffs assert viable claims for securities fraud against the accounting firm, with a particularity sufficient to satisfy Rule 9(b).

The seminal case of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), involved charges against an accounting firm that it had violated § 10(b) and Rule 10b–5 by failing to conduct proper audits of a brokerage firm which perpetrated a fraudulent scheme upon the brokerage customers. The Supreme Court held, in the context of the accountants' asserted liability, that scienter was a required element of the implied cause of action under the statute and the rule. The Court expressly left open the question whether reckless behavior constituted intentional conduct sufficient to impose civil liability, but noted that "[i]n certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some acts." *Id.* at 193 n. 12, 96 S.Ct. at 1381 n. 12.

Since *Ernst & Ernst,* the Second Circuit has repeatedly held that for primary § 10(b) violations, an allegation of recklessness is sufficient. *See, e.g., Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 575 (2d Cir.), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982); *IIT, an International Investment Trust v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980); *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1305 (2d Cir.1973) (*en banc*). The Second Circuit has characterized recklessness as "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Rolf v. Blyth Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.) (quoting *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir.1977)), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

■ It is now well settled that an accountant's recklessness is sufficient to give rise to primary liability. *See, e.g., CL–Alexanders Laing & Cruickshank v. Goldfeld,* 739 F.Supp. 158, 163 (S.D.N.Y.1990); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 545 F.Supp. 1314, 1356 (S.D.N.Y.1982); *see also Akin v. Q–L Investments, Inc.,* 959 F.2d 521, 525–26 (5th Cir.1992) ("There are three routes by which an accountant may be held liable under [Rule 10b–5]. First, an accountant is directly liable for intentional or reckless misrepresentations if he knows his statements will be communicated to third parties.") (footnote omitted).

As noted, plaintiffs also charge Ernst & Young as an aider and abettor of the primary liability of other defendants. The Second Circuit has held "that recklessness satisfies the scienter requirement where 'the alleged aider and abettor owes a fiduciary duty to the defrauded party,'" *Sirota* at 575 (quoting *Rolf* at 570 F.2d 44). The Second Circuit left open in *Sirota* whether recklessness is sufficient for secondary liability in the absence of such a relationship. I need not address that question in the case at bar because Ernst & Young's undertaking to furnish a comfort letter to plaintiffs created a fiduciary relationship between those parties.

Accordingly, plaintiffs state viable § 10(b) claims against Ernst & Young. It therefore becomes necessary to consider the viability of Ernst & Young's claims against the settling defendants.

### III.

■ It is well settled that Ernst & Young would not be entitled to indemnity from another with respect to liability based upon its own intentional or reckless conduct. *See Globus v. Law Research Services, Inc.,* 418 F.2d 1276, 1288 (2d Cir.1969); *Department of Economic Development v. Arthur Andersen & Co.,* 747 F.Supp. 922, 931 (S.D.N.Y.1990); *In re Citisource Securities Litigation,* 694 F.Supp. 1069, 1078–9 n. 15 (S.D.N.Y.1988); *Odette v. Shearson, Hammill & Co.,* 394 F.Supp. 946, 956 (S.D.N.Y.1975).

However, the Supreme Court has recently held that "[t]hose charged with liability in a 10b–5 action have a right to contribution against other parties who have joint responsibility for the violation." *Musick Peeler & Garrett v. Employers Insurance of Wausau,* — U.S. —, —, 113 S.Ct. 2085, 2092, 124 L.Ed.2d 194 (1993). In the first sentence of his opinion for the Court, Justice Kennedy posed the pertinent inquiry:

> Where there is joint responsibility for tortious conduct, the question often arises whether those who compensate the injured party may seek contribution from other joint tortfeasors who have paid no damages or paid less than their fair share.

*Id.* at —, 113 S.Ct. at 2086. The Court concluded in *Musick* that § 10(b) and Rule 10b–5 imply a private right of action for contribution.

If plaintiffs at bar prove their allegations against Ernst & Young, they will have shown Ernst & Young to be a joint tortfeasor with the settling defendants. In the present posture of the case, plaintiffs and the settling defendants prefer to stress Ernst & Young's discrete and separate obligations arising out of the comfort letter Ernst & Young gave to plaintiffs. If Ernst & Young's liability arises from the comfort letter, plaintiffs and the settling defendants argue, the accounting firm cannot be regarded as acting in concert with the settling defendants, so that no right to contribution exists, and Ernst & Young loses nothing through the barring of claims against the settling defendants.

For tactical reasons the proponents of the settlement characterize plaintiffs' claims against Ernst & Young too narrowly. Those claims are based in significant measure upon the accounting firm's conduct as auditor of Cortec's financial statements, quite apart from Ernst & Young's obligations to plaintiffs in connection with the comfort letter. Thus plaintiffs argued in opposing Ernst & Young's motion to dismiss the amended complaint:

> Despite knowing Cortec's historical use of these improper practices and giving a specific instruction on the accruals, *Ernst & Young's management letter, issued in March 1989 as part of its year end audit in 1988, did not identify the accrual or reserve procedures as ones that needed to be changed.* Had it done so, Ernst & Young would have tipped plaintiffs off to Cortec's misconduct and misleading financials.

Brief at 45 (emphasis in original).

In short, plaintiffs allege joint responsibility for tortious conduct, with all defendants, settling and nonsettling, having acted as joint tortfeasors. The Supreme Court declared in *Musick* Ernst & Young's right to claim contribution against the settling defendants, in order that the law may deal justly with "joint tortfeasors who have paid no damages or paid less than their fair share." — U.S. at —, 113 S.Ct. at 2086.

In a case uncomplicated by partial settlement, defendants assert cross-claims for contributions against each other, discovery is completed, the case goes to trial, and the factfinder determines, among other issues, the relative culpabilities of the several defendants. By that determination the factfinder ensures that each defendant pays its fair share of the compensation for plaintiff's injury.

Where plaintiff settles with some defendants but presses the claim against a nonsettling defendant, the law remains concerned with a fair result as between all defendants, but that issue is necessarily resolved in a different fashion.

## IV.

In partial settlement cases, the courts first focus upon the method for determining how a judgment against a nonsettling defendant should be reduced in light of a settlement by the other defendants.

The cases recognize three basic methods, summarized in *MM & P* at 1028–1029. They are the *pro rata*, the proportionate fault, and the *pro tanto* methods. The *pro rata* method, which apportions an equal share of the liability to each defendant in the action and regards relative culpability as irrelevant, is rarely invoked, and requires no further present consideration. The parties at bar urged upon me the proportionate fault and *pro*

*tanto* methods, Ernst & Young preferring the former while plaintiffs and the settling defendants prefer the latter.

Under the proportionate fault method, the "jury assesses the relative culpability of both settling and nonsettling defendants, and the nonsettling defendant pays a commensurate percentage of the judgment." *MM & P* at 1029, (citing and quoting *In re Jiffy Lube Sec. Litigation,* 927 F.2d 155, 160 n. 3 (4th Cir.1991)). Plaintiffs are not enamored of the proportionate fault method because they bear the risk of letting the settling defendants off too cheaply.

The *pro tanto* method reduces a nonsettling defendant's liability for a judgment against him in the amount paid settling defendants. Plaintiffs prefer this method because the risk that plaintiffs let the settling defendants off too cheaply is cast upon the nonsettling defendant, who (if found liable as a joint tortfeasor) must pay the balance of the plaintiffs' damages.

I do not read the Second Circuit's opinion in *MM & P* as an unqualified endorsement of either method. The court's analysis at 1029 consists in large measure of listing the shortcomings of each. Thus the court criticized the proportionate fault method because it enables a holdout defendant to make settlement difficult for the plaintiffs; and the determination of the relative fault of each party after full plenary trial "imposes a considerable burden on a factfinder and 'obviate[s]' much of the advantage of partial settlement to the judicial system." *MM & P* at 1029 (citing and quoting *In re Atlantic Fin. Mgt. Sec. Litigation,* 718 F.Supp. 1012, 1018 (D.Mass.1988)).

The shortcomings of the *pro tanto* method, as articulated in *MM & P,* are that it can result in judgment reduction that is inconsistent with proportionate fault, and "leaves 'the field of settlement very much open to collusive arrangement between a plaintiff and a favored joint tortfeasor'" *Id.* at 1029 (citing and quoting *Gomes v. Brodhurst,* 394 F.2d 465, 468 (3rd Cir.1967)).

*MM & P* is instructive more for what the Second Circuit did than for what it said. While reversing the district court's approval

of the settlement and claims bar, the Second Circuit did not remand the case with instructions to conduct a full trial on the merits. Had the Second Circuit embraced the proportional fault method as a matter of principle, that instruction would have been necessary to implement the principle in practice. Rather, the Second Circuit instructed the district court to conduct a "fairness hearing," *id.* at 1033, declining as it did so "to delineate either the requirements or all of the appropriate considerations for that hearing. The test must be one of fairness." *Id.* at 1032 (footnote omitted). The concept of a fairness hearing reflects judicial concern about possible collusion between a plaintiff and a favored joint tortfeasor. The Second Circuit stated in *MM & P* at 1029: "Some jurisdictions have recognized this problem and applied a *pro tanto* approach that requires a showing of good faith and a hearing on culpability before approval of a settlement bar," citing the Fourth Circuit's opinion in *Jiffy Lube, supra,* as an example, and going on in *MM & P* to mandate the same approach.

■ Accordingly, I understand the Second Circuit rule to favor the *pro tanto* method as one preserving the advantage of partial settlements, so long as the possibility of collusion is negated, and the district court evaluates the fairness of the bar order in a hearing, the dimensions of which depend upon the circumstances of the case. For this reason, I stated in this Court's memorandum dated March 22, 1993 that I would apply the *pro tanto* method.

■ In the case at bar, I do not understand Ernst & Young to contend that plaintiffs, acting in bad faith, entered into a collusive arrangement with the settling defendants in order to disadvantage Ernst & Young. On the contrary: plaintiffs have repeatedly asserted, and Ernst & Young has not denied, that plaintiffs offered Ernst & Young the opportunity to contribute to an overall settlement in an amount significantly less than the damages plaintiffs may be able to prove. Ernst & Young declined to make any settlement contribution. The accounting firm had every right to do so. I reject any suggestion by plaintiffs or the settling defendants that Ernst & Young's refusal to partic-

ipate in the settlement is probative of the fairness of the settlement and the bar order to Ernst & Young. It is apparent, however, that Ernst & Young does not charge the other parties with collusion.

The issues, then, are the fairness *vel non* of the proposed settlement and bar order; and the threshold issue of whether that determination can be made on the present record, or whether further discovery is required.

### V.

It is readily apparent that substantial questions of fairness to Ernst & Young arise. Assuming that through its reckless disregard Ernst & Young is cast into primary or secondary liability for securities laws violation, that liability depends *au fond* upon the failure of auditors and accountants to detect and advise of the wrongdoing of others. If bad debts were fraudulently understated and reserves fraudulently decreased in order to entice plaintiffs to purchase to Cortec, the fraudsmen devising and implementing the scheme were not employees of Ernst & Young. If accruals of income violative of GAAP were resumed by the company during the first quarter of 1989, the participants in that fall from a state of accounting grace where not employees of Ernst & Young. At least that is so if the basis for Ernst & Young's liability is reckless disregard, and not knowledge and direct participation in the alleged fraud; and it is reckless disregard which seems to form the main basis of plaintiffs' claims against the accounting firm. In those particular circumstances, Ernst & Young would appear to have significant claims for contribution against the entities or individuals whose initial wrongdoing Ernst & Young is charged with having recklessly disregarded. And yet I am asked to approve as fair to Ernst & Young a settlement which would release all defendants except Ernst & Young for payments totalling $4,250,000, in a case where plaintiffs paid $53 million for old Cortec and claim they were cheated. The present motion papers to not make clear what amount of damages plaintiffs hope to prove against Ernst & Young. But the general measure of damages in securities fraud is the difference between what the victim paid and the value of what he obtained, and it seems fair to assume that plaintiffs will assert a claim against Ernst & Young for many millions of dollars; plaintiffs say that Cortec "is now in liquidation." Affidavit of Michael H. Barr, Esq. at ¶ 3. Moreover, Ernst & Young would be barred by the settlement from asserting any claims for contribution against the settling defendants.

Without intimating any final view on the fairness of this proposed settlement, I can say without difficulty that substantial questions arise.

The issue may be posed by a hypothetical. Plaintiffs' complaint claims $53 million in compensatory damages plus interest. That is the amount they paid for old Cortec. Assume for the sake of discussion that Cortec had some value at the time of plaintiffs' purchase, and plaintiffs' provable damages on their § 10(b) claims amount to $42.5 million. On that assumption—and it is no more than that—the settling defendants' payments amount to one-tenth of plaintiffs' damages, leaving Ernst & Young to pay the remaining nine-tenths. Such a ratio would raise serious questions of fairness, especially if Ernst & Young's liability arises from its reckless disregard of the affirmative wrongdoing of others.

Thus far I have limited the discussion to the relative culpability of the defendants, an important consideration, as *MM & P* holds. However, *MM & P* also teaches that other factors must be considered in appraising the fairness of a settlement: "[T]he likelihood of the plaintiff's prevailing at trial and the adequacy of the resources of the most culpable party," *id.* at 1031. The Second Circuit in *MM & P* derived from the Manual for Complex of Litigation (Second) § 30.46 at 244–45 the principle that "[A] partial settlement providing little relief may be entirely satisfactory if the settling defendant has strong defenses or is impecunious." *See also TBG, Inc. v. Bendis,* 811 F.Supp. 596, 605 (D.Kan. 1992) (in appraising the fairness of a settlement using the *pro tanto* method, the relevant factors include "the ability of the settling defendant to pay more" and "the weakness of the claims against the settling defen-

dants both absolutely and relative to the other defendants").

Reverting to the hypothetical used *supra*, if plaintiffs prove damages of $42.5 million and the settling defendants cannot pay more than a total of $4,250,000, it is not inherently unfair to require Ernst & Young to pay the balance of plaintiffs' damages, always assuming, of course, that plaintiffs establish the accounting firm's liability.

## VI.

The question therefore arises whether the present record is sufficient to appraise the fairness of the settlement in the light of these factors. One district court, in the course of expressing its preference for the proportionate fault method, stated that "every court which has adopted the *pro tanto* method did so after virtually all discovery was completed." *USF & G v. Patriot's Point Development Authority*, 772 F.Supp. 1565, 1573 (D.S.C.1991), citing cases. The district court in *TBG, Inc., supra*, which preferred the *pro tanto* method, saw no need for a further evidentiary hearing where "[a]ll parties have submitted extensive evidentiary materials. In light of those submissions we do not deem an additional evidentiary hearing necessary to determine the fairness of the settlement." 811 F.Supp. at 605 n. 17. As noted, the Second Circuit in *MM & P* left the "requirements" and the "appropriate considerations" for a fairness hearing to the district court's discretion on a case-by-case basis.

In the case at bar, a good deal of discovery has been accomplished. Many documents have been produced: probably most, if not all, of the relevant ones. Fourteen witnesses have been deposed. But significant witnesses have not been deposed. No officer or employee of Ernst & Young has testified. Defendants Yerke and Canipe have not testified. Yerke was president of old Cortec. Canipe was the vice president, finance. The documents submitted on this motion indicate, as one would expect, that Yerke and Canipe were the Cortec officers communicating with Ernst & Young in connection with the auditors' reports central to the case. I do not see how it is possible to evaluate the strengths of plaintiffs' claims against Ernst & Young, or the latter's claims for contribution against the settling defendants or some of them, on the basis of a record devoid of any testimony from these sources at least.

Accordingly the record must be enlarged if this settlement and its accompanying bar order is to be approved. I am told that if the settlement is not approved now "and the parties are forced to prepare this case for trial," 45 and perhaps in excess of 60 additional witnesses must be deposed. Affidavit of Daniel L. Goldberg, Esq., counsel for the Dubin Clark defendants, at ¶ 6. Assuming that this is not an exercise *in terrorem*, it does not follow that full preparation for trial is required to make a record sufficient for appraising the fairness of the settlement. The key considerations are: (1) the strength of plaintiffs' claim that Ernst & Young knew of fraudulent statements or omissions in Cortec's financial statements and deliberately participated in the fraud; (2) the strength of plaintiffs' alternative claim that Ernst & Young acted with a reckless disregard of truth which was tantamount to knowledge; and (3) the strength of Ernst & Young's claims for contribution against each particular defendant. While Ernst & Young may rely in part for its contribution claims on evidence adduced by plaintiffs against one or more settling defendant, it cannot play dog in the manger at this stage of the litigation. Ernst & Young cannot defeat this settlement by general assertions of inadequate compensation for the loss of its counterclaims. It must develop evidence as to which defendant or defendants should respond to it in contribution, and why.

I will grant the parties ninety (90) days from the date of this opinion and order to enlarge the record in the context of this motion to approve the settlement. It should be possible to achieve that purpose without full preparation for trial, thereby achieving at least a partial savings of resources, should the settlement ultimately be approved. I think that a measure of judicial supervision may be helpful in that regard. Accordingly I direct that any party initiating further discovery include in its notice a description of the subjects to be inquired into and their

relation to the issues underlying the fairness of the proposed settlement. If disputes arise with respect to the necessity of a noticed inquiry, the Court will resolve them on letter briefs or at a hearing in case of need.

I note that there is no proof in the present record with respect to the financial ability of any defendant to respond to a judgment in plaintiffs' favor. As noted, if a settling defendant is impecunious, that may be factored into an appraisal of the fairness of the settlement. All the record presently shows is the settling defendants' preference to avoid further litigation expense. That is understandable but insufficient for present analysis. This subject may also be addressed in an expanded record.

I defer to a later day consideration of the breadth of a bar order, if the settlement is ultimately approved and a bar order entered. That issue, an important element in the fairness analysis, may also be better evaluated on a more complete record.

For the foregoing reasons, the motion to approve the proposed settlement is denied on the present record, without prejudice to renewal on a more complete record.

The parties are directed to proceed in a manner consistent with this opinion and to attend a status conference in Room 307 at 2:00 p.m. on March 25, 1994.

It is SO ORDERED.