### In re NBW COMMERCIAL PAPER LITIGATION.

Civ. A. No. 90–1755 (RCL).

United States District Court, District of Columbia.

Nov. 3, 1992.

Thomas W. Queen, Joseph L. Ruby, Wiley, Rein, & Fielding, Susan G. Braden, Anderson, Kill, Olick & Oshinsky, F. Joseph Nealon, Amy Sanborn Owen, Ballard, Spahr, Andrews & Ingersoll, David J. Frantz, Walter G. Birkel, Conlon, Frantz, Phelan, Knapp, Pires & Birkel, Charles Lee Eisen, Christopher M. McMurray, Kirkpatrick & Lockhart, Washington, DC, Craig C. Reilly, Murphy, McGettigen & West, PA, Alexandria, VA, Philip M. Musolino, Loewinger, Brand & Kapstatter, George A. Fisher, Stein, Mitchell & Mezines, Washington, DC, John H. Harman, Jeff Orenstein, Coggins & Harman, PA, Silver Spring, MD, Stuart Levine, Towson, MD, Paul Blankenstein, Angela D. Sheehan, Gibson, Dunn & Crutcher, Christine C. Ryan, Paul Fisher, Jordan, Schulte, & Burchette, Richard J. Morvillo, Richardson, Berlin & Morvillo, Edward R. Leahy, Joel Harris, Thacher, Proffitt & Wood, Carl L. Gell, Cooter & Gell, William F. Sheehan, Christopher E. Palmer, Shea & Gardner, Michael Evan Jaffe, Howard B. Possick, Arent, Fox, Kintner, Plotkin & Kahn, Aaron L. Handleman, Eccleston & Wolf, Washington, DC, Leslie M. Alden, Verner, Liipfert, Bernhard, McPherson & Hand, McLean, Va., for plaintiffs.

Abraham D. Sofaer, William R. Stein, Robert P. Reznick, Lawrence F. Bates, Hughes, Hubbard & Reed, Burton H. Finkelstein, Finkelstein, Thompson & Loughran, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER

LAMBERTH, District Judge.

Plaintiffs in these consolidated cases are all holders of commercial paper issued by Washington Bancorporation ("WBC"), the holding company which owned the National Bank of Washington ("NBW"). On May 7, 1990, WBC defaulted on all of its outstanding commercial paper, including approximately $35.2 million owned by the various plaintiffs in these actions. Plaintiffs here are seeking damages from NBW, now in receivership under the auspices of the Federal Deposit Insurance Corporation ("FDIC"), and certain individual officers and directors ("the individual defendants"), for their alleged role as the sellers of commercial paper. Plaintiffs and the individual defendants ("the settlors") have concluded a partial settlement which contemplates a $7.6 million cash payment to the plaintiffs. The settlement also includes a contribution and indemnity bar that would prevent the FDIC from seeking any funds from individual defendants (or from certain non-defendants) and a *pro tanto* judgment reduction provision which would create a dollar-for-dollar offset of the settlement on any judgment rendered against the FDIC. Because these provisions substantially affect the rights of the FDIC and require the exercise of the court's power, the court must carefully consider whether to approve the settlement. The court has considered the memoranda submitted by all counsel, including those of the amici non-party settlors and Luther Hodges, whom the court has permitted to intervene for the sole purpose of opposing this motion.

### I. Factual Background

Although the parties have not engaged in full discovery in this case, the basic facts are not substantially in dispute. WBC owned NBW and the two corporations shared several officers and directors. Many of the directors of NBW were shareholders in WBC. WBC instituted the commercial paper program in the mid–1980's to generate cash-flow. Most of the commercial paper was sold on an overnight basis—

wealthy customers of NBW would purchase the commercial paper on a given day and roll it over into more commercial paper the following day. NBW was the sole agent for the sale of commercial paper. As time went on, WBC became increasingly reliant on the roll-over of commercial paper to fund its program; in other words, WBC only had enough money to pay off its commercial paper obligations if the holders of the commercial paper rolled over their funds into the next day. During the first quarter of 1990, WBC sustained substantial losses and federal regulators became concerned about the solvency of the bank. In April of 1990, all of the banks which provided back-up lines of credit for the WBC commercial paper program withdrew their credit. The sale of commercial paper after these back-up lines of credit had failed breached certain covenants to which WBC was a party and also violated Federal Reserve guidelines. Despite warnings from the Federal Reserve and the Office of the Comptroller of the Currency, WBC continued to sell commercial paper. On May 7, 1990, WBC defaulted on all of its outstanding commercial paper. Subsequently, WBC filed for bankruptcy; NBW was declared insolvent and the FDIC was appointed receiver.

## II. The Proposed Settlement

Plaintiffs are holders of WBC commercial paper. In addition to pursuing their remedies against WBC in bankruptcy proceedings, these individuals and institutions have sued NBW (now represented by the FDIC) and certain officers and directors of NBW for their participation as sellers of commercial paper. The parties engaged in settlement negotiations which appeared to bear fruit in late 1991; the parties indicated to the court that settlement was a real possibility. The FDIC, however, halted negotiations in order to obtain the court's ruling on certain special defenses which would absolve it of all liability. The plaintiffs, while litigating the FDIC's defenses under the common-law *D'Oench* doctrine

and various provisions of Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), began bilateral negotiations with the individual defendants. The court dismissed the majority of plaintiffs' claims, but found that a few of the claims survived. Although the court and most of the parties hoped for a settlement following the court's opinion, the FDIC has maintained the position that they have no liability.

Plaintiffs and the individual defendants returned to the bargaining table and hammered out a bilateral settlement which is substantially similar to the settlement which had been contemplated prior to the court's *D'Oench* ruling. The individual defendants agreed to pay plaintiffs $7.6 million, only slightly more than the $7.5 million that had been tentatively set by the earlier settlement negotiations. The bulk of this money would derive from the directors' and officers' liability insurance policy which has funded the individual defendants' participation in this lawsuit. In addition, the proposed settlement would prohibit the FDIC from seeking any contribution, indemnity, or other claims in connection with the commercial paper program, however denominated, from the individual defendants. Further, as recompense for the decrease in the D+O insurance policy which covers all of the former officers and directors of NBW, the remaining officers and directors of NBW, who are not defendants, would also be protected by the claims bar. Without these protections, the individual defendants would have little incentive to settle.

In addition, the proposed settlement incorporates a *pro tanto* judgment reduction provision. Were the court or a jury to find the FDIC liable to a plaintiff, the judgment would be reduced by some amount to account for the settlement which has already partially compensated the plaintiff.[1] Under the *pro tanto* method, the judgment is reduced by the dollar amount of the partial settlement. Thus, if the settlement were

---

**1.** None of the parties made any suggestion in their papers how any recovery from WBC should be counted.

approved and judgment were entered against the FDIC for the $35.2 million in commercial claims, the FDIC would be liable for $27.6 million. This judgment reduction method is particularly advantageous to plaintiffs because it permits them to recover all of their losses, without regard to the relative fault of the various defendants.[2] The non-settling defendant, here the FDIC, is at risk for a loss that is potentially larger than that which its relative fault would suggest because it cannot obtain contribution from the settling defendants.

The plaintiffs and the individual defendants represent that the proposed settlement is fair and that $7.6 million is the most that the individual defendants can reasonably pay. Rejecting the settlement would mean that the bulk of the funds in the insurance policy would flow to the hundreds of lawyers in this case, rather than to the injured plaintiffs. The FDIC opposes the settlement as unfair. In particular, the FDIC questions the motives of the plaintiffs and individual defendants; although falling short of alleging outright collusion, the FDIC raises the specter of "insider plaintiffs" and the possibility that the settlement will simply be a "war chest" for pursuing claims against the deep pocket FDIC. More importantly, the FDIC argues that the specific provisions, including the contribution bar and the *pro tanto* judgment reduction provision, handcuff them from pursuing their rightful remedies and leave the federal government "holding the bag" for the misdeeds of others.

### III. Issues and Defenses Peculiar to Certain Plaintiffs

As an initial matter, the FDIC raises concerns about certain plaintiffs who either are in default on loans to NBW or were allegedly "insiders" at NBW. The FDIC specifies no particular effect that these factors should have on the court's consideration of the settlement, and the settling parties argue that these provisions are irrelevant. The court shall consider each concern in brief below.

#### a. Loan Defaults

The FDIC raises the fact that certain of the plaintiffs have defaulted on over $60 million in loans to NBW; these claims total substantially more than all of the commercial paper claims combined. The FDIC stated in its opposition memorandum that it would bring these claims after it has had the opportunity to conduct discovery.

The court does not see the relevance of these claims to the proposed settlement. If FDIC is found to be liable to a plaintiff who is allegedly in default, then the FDIC may be able to obtain an offset. The individual defendants have no defense on account of the defaults, and, even if they had such a defense, they have waived it by agreeing to the settlement. Further, the court does not see why the bank needs discovery to bring a loan default action against these plaintiffs, or indeed, why these actions must be brought in the commercial paper cases; all of the necessary documentation—that the loan was made and that the borrower failed to pay in a timely fashion—should be in the records of the bank, which the FDIC possess. Thus, the court sees no reason to consider these claims, particularly as the FDIC has not seen fit to bring them before this or any other court.[3]

#### b. Insider Plaintiffs

█ The FDIC also alleges that certain plaintiffs were owned and controlled by officers or directors of NBW who, the FDIC claims, may have been responsible for the failure of the bank and the disastrous commercial paper program. Accordingly, the FDIC argues that its settlement credit should not be dissipated by any

---

2. Courts have also implemented proportional fault judgment reduction, which permits recovery from the non-settlor at a level commensurate with the non-settlor's proportion of the judgment in favor of plaintiff, and the *pro rata* method, which divides any judgment for plaintiff into equal shares to paid by each defendant.

3. The FDIC expresses concern that they will not be appropriately credited for funds paid as part of the settlement. To the extent, however, that this concern is valid, the court could fashion a remedy if any unfairness results.

plaintiffs who were insiders. Once again, the court rejects this attempt to assert the rights of the settling defendants. That the individual defendants have agreed to waive their defenses cannot be said to prejudice the FDIC in such a way as to stall the proposed settlement. In addition, the FDIC has presented nothing but bare bones allegations concerning "insider plaintiffs." Indeed, the FDIC has withdrawn such allegations against Colson Services, and the plaintiff Former Shareholders of FRITECO, Inc., makes a strong case that the FDIC's arguments are faulty as well.

The court finds nothing collusive about the bargain struck by the plaintiffs and individual defendants. The court has observed the efforts of counsel throughout this litigation and has general knowledge of the hard-fought negotiations that led to the proposed settlement. Simply because the settlement was designed to the advantage of the settling parties, as opposed to the interests of a non-settling third-party is no reason to suspect collusion; counsel for FDIC as much as admitted this at oral argument by conceding that the settling parties position was derived simply from hard-nosed litigating. Further, the FDIC was involved in the negotiations from the very beginning which led to the original $7.5 million figure. If indeed there had been any collusion, the FDIC should have put forth some evidence, if only by affidavit. Thus, the court finds no hint of collusion, but this finding bears little on the question of fairness. It is to this central question that the court now turns.

### IV. *The Fairness of the Proposed Settlement*

Under the terms of the proposal, the settlement will fail if the court rejects either of two provisions—the claims bar or the *pro tanto* judgment reduction provision. The FDIC has three principal objections to these two key elements of the settlement. First, the FDIC argues that the settlement bar is too broad because it precludes recovery from the officers and directors who are not parties to this litigation and who thus have given nothing to the litigation. Second, the FDIC argues that the settlement bar is too broad because it precludes indemnity and so-called "independent" claims, which, the FDIC argues, cannot be barred in the same way as contribution claims. Third, the FDIC claims that the proposed settlement leaves the FDIC "holding the bag" because it would apply a *pro tanto* judgment reduction method. The plaintiffs and the individual defendants object strenuously to all of the FDIC's contentions.

The court cannot, however, treat these two provisions of the proposed settlement distinctly. The interplay between the two motivates the FDIC's objections—the FDIC might be solely liable for $27.6 million of the alleged $35.2 million in commercial paper claims. The combination of a *pro tanto* approach and a broad settlement bar creates the maximum exposure for the FDIC, whereas a broad settlement bar in conjunction with a proportional fault approach to judgment reduction would significantly reduce the FDIC's potential loss, but threaten plaintiff's ability to fully recover. Other combinations yield other results and varying risks to parties and non-parties. Thus, although the court will discuss the individual provisions below to some extent, the settlement can only be assessed as a whole. As such, the court will look to the fundamental fairness of the proposed settlement first (rather than last) because this inquiry sheds light on the appropriateness of combining a *pro tanto* approach with a broad claims bar in this particular case, given the information known to the court at this time.

#### a. The Fairness Inquiry

 Courts adopting the *pro tanto* judgment reduction method must make a fairness inquiry to insure that the non-settlors are not unfairly prejudiced by the partial settlement. *See MFS Municipal Income Trust v. American Medical Int'l, Inc.,* 751 F.Supp. 279 (D.Mass.1990); *In re Terra–Drill Partnerships Sec. Lit.,* 726 F.Supp. 655 (S.D.Tex.1989). In addition, courts considering a contribution and indemnity bar must examine the impact of such a bar on the non-settlor, who will be

forced to pay whatever liability is subsequently determined, without recourse to the settling defendants. *See In re Masters Mates & Pilots Pension Plan Lit.*, 957 F.2d 1020 (2d Cir.1992). *In re Nucorp Energy Sec. Lit.*, 661 F.Supp. 1403 (S.D.Cal.1987). In both situations, the settlement goes beyond a contract between the settling parties and affects the substantive rights of a third party. Courts have either looked to the "totality of the circumstances," *see Nelson v. Bennett*, 662 F.Supp. 1324 (E.D.Cal.1987), or identified a few basic factors which would bear on the settlement's fairness. *See Nucorp*, 661 F.Supp. at 1408–10. Some of the factors include "participation of an independent magistrate in the settlement negotiations," "the adequacy of the settlement amount in light of the possible uncollectability of any larger trial judgment which might be entered against the settling defendants," "the adequacy of the settlement in light of any uncertainties surrounding the settling defendant's liability," and "[w]hether the settlement amount bears a reasonable relationship to the settling defendant's proportional share of the total damages." *Id.* at 1408.

In all of the various formulations of the fairness inquiry, the court has examined the comparative fault of the defendants to ensure that the settlors were paying an amount "reasonably related to the share of plaintiffs' total damages properly attributable to them on the basis of their comparative fault." *Nucorp*, 661 F.Supp. at 1410. Evidence of relative fault would more than aid the court in its fairness inquiry; it is absolutely crucial. Plaintiffs argue that their interest in obtaining full recovery trumps any concerns about inequities among culpable defendants. While the court agrees that, under a joint and several liability scheme, plaintiffs have the right to recover from whichever defendant can pay and may leave squabbling about relative fault to the defendants, this settlement not only ensures plaintiffs' right to recovery, but also would resolve all disputes between the defendants. The claims bar does not

affect the plaintiffs' rights—it simply fixes the relative liability of the defendants. A *pro tanto* settlement without a claims bar permits plaintiff the possibility of full recovery and averts prejudice against the non-settlors; although the non-settling defendants may eventually be liable for a disproportionate share of liability, they will theoretically be able to reduce their liability to a level commensurate with their relative fault by seeking contribution from the settling defendants. Were the claims bar combined with a proportional fault judgment reduction provision, the non-settling defendants would not be so concerned about the claims bar because their liability would be confined to their relative fault.[4]

■ Only the combination of a complete claims bar and the *pro tanto* judgment reduction method has the potential to leave non-settlors with an exposure that is out of proportion with relative fault. The presence of a relative culpability factor in the *pro tanto* fairness inquiry is thus necessary to prevent great prejudice to the non-settlor. Without this part of the inquiry, *pro tanto* settlements could be tremendously unfair. Because the plaintiffs are assured of potential recovery from the non-settlor, there is little incentive to squeeze more money out of the settling defendants; plaintiffs have minimal interest in parcelling out liability among defendants appropriately. The settling defendants have a powerful incentive to get out of the case with as small a payment as possible. Although there is a strong federal policy in favor of settling cases, the decision of some defendants to settle is not of such magnitude that all concerns about fairness *among* defendants should evaporate. Thus, when the *pro tanto* approach is combined with a complete claims bar, the court must make a close inquiry into the relative fault of the defendants.

■ Neither the plaintiffs nor the individual defendants have made any persuasive argument to this court regarding the relative culpability of the individual defen-

---

**4.** The FDIC would nonetheless raise their arguments concerning the impropriety of imposing a settlement bar which precludes indemnity and "independent" claims.

dants as against the non-settling FDIC. The individual defendants suggest that they are less likely to be held legally liable than the FDIC, which stands in the shoes of the corporate entity which the individual defendants are alleged to have run into the ground.[5] The court is not persuaded by these arguments, which do not develop the factual basis on which a court could assess relative culpability. Further, while these arguments technically and abstractly address the percentage chance that the individual defendants will be held liable, they do not account for the possibility that a finder of fact, if the individual defendants are determined to be liable, might assess much of the liability to the actual individuals running the bank, rather than to the bank itself, which is now a drain on the federal treasury. In addition, the claims bar also protects the non-party settlors against whom the FDIC may potentially have claims; although the fact that the FDIC has not brought claims against these other individuals is some evidence that the claims are minimal, the court is not in a position to make a determination that would insulate them from all liability. Having heard absolutely no evidence about the relative culpability of the settling defendants, the non-party settlors, and the FDIC as receiver for NBW, the court is unable to approve the settlement at this time.

■ The settling parties have essentially two arguments to counter this conclusion. First, they argue, the federal policy of encouraging settlements is "overriding." *See Nelson*, 662 F.Supp. at 1334–35; *Alvarado Partners v. Mehta*, 723 F.Supp. 540, 550 (D.Colo.1989). Without a contribution bar, defendants would be unlikely to settle because they would remain threatened by third party liability. *See Nucorp*, 661 F.Supp. at 1408. Plaintiffs, on the other hand, need the *pro tanto* approach, which provides the certainty that they may fully recover their losses. Any other result, argue the settlors, would unduly benefit recalcitrant non-settlors. Further, the non-settlor would be able to frustrate a settlement which both plaintiffs and certain defendants desire.[6] When combined with the need to ensure that plaintiffs are wholly compensated, the settlors argue that society is willing to bear unfairness between culpable parties. Although the court would like these consolidated cases settled as much as any party, the court must disagree that settlement overrides all equities. Simply because a defendant vigorously contests its liability, as the FDIC does here, does not mean that it should be punished excessively. Awarding costs and attorneys' fees, if the defendant's position proves to be untenable, usually serve this function well.

The settlors' second argument is more difficult to rebut. Implicit in all that the settlors have said both in their briefs and at oral argument is the idea that, regardless of the principled legal distinctions which the court might seek to make, reality should trump. The settlors represent that the individual defendants cannot possibly pay more than the $7.6 million tendered in the settlement and that the FDIC has no claims against the non-party settlors. Thus, there is no unfairness to the FDIC; neither the plaintiffs nor the FDIC could get a better deal at any time in the future, because the director' and officers' liability policy will simply waste away into the pockets of local lawyers. Indeed, argue the settlors, not approving the settlement would *prejudice* the FDIC because the insurance policy would be frittered away by the ongoing litigation, such that the FDIC would be on the hook for even greater liability if it were found to be jointly and severally liable. Under this theory, any consideration of relative fault simply drops out of the equation because relative fault is immaterial when, at the end of the litiga-

---

**5.** The court notes the conceptual difficulty with assessing comparative fault between the officers and directors of a company and the entity itself. The corporation's liability is completely dependent on the acts of its employees, and particularly its officers and directors.

**6.** According to the settlors, this problem is intensified by a defendant, such as the FDIC, which has no financial constraints and will litigate the case fiercely.

tion, the FDIC, as a joint and severally liable defendant, could recover no more than the $7.6 million in contribution or indemnity (or from independent claims) from the individual defendants.[7] In this situation, it is better that one of the culpable defendants (here the FDIC), rather than the innocent plaintiff, be victim to the shortfall caused by the individual defendants' financial situation. Under the factors laid out in *Nucorp,* the court should thus focus only on the settling defendants' ability to pay and ignore relative fault.

At least one other court has considered the proportionate fault in a case where the settling defendants only asset was a liability insurance policy. *See Nelson,* 662 F.Supp. at 1338 (considering whether settlement fell "within the reasonable range of their potential liability"). Nevertheless, the argument might be persuasive if the court found that anything more from the individual defendants would simply be blood from a stone. At this juncture, the court cannot so conclude. Counsel for one of the individual defendants has admitted that his client is a "paper millionaire" but will not be contributing anything to the settlement except some portion of the liability policy.[8] Further, the non-party set-

tlors apparently have substantial assets, perhaps in excess of $100 million.[9] To bar the FDIC from obtaining relief from these parties is simply not fair. The settlors argue that, if the FDIC had claims, they should have brought them, but the court cannot create a statute of limitations out of thin air and enforce it against the FDIC; that is essentially what the settlors would have the court do.

Plaintiffs have told this court that they do not believe that they could get a better deal, given all of their financial considerations. By objecting to this settlement, the FDIC is essentially saying that they are willing to take their chances; the court does not believe that, at this stage, the reality of the parties' financial situation is so clear that the court can override this decision.

### b. Additional Concerns
#### 1. The FDIC

The court would also note two other concerns about the settlement. The arguments justifying the *pro tanto* approach are strong.[10] The court agrees that it does encourage settlement and ensures that plaintiffs recover; in this sense, the *pro tanto* method is a direct corollary to

7. This theory also would suggest that the court need not await substantial discovery in order to make a fairness determination, because perpetuating the litigation will simply hurt all involved, except the lawyers. *But see U.S.F. & G. Co. v. Patriot's Point Dev. Auth.,* 772 F.Supp. 1565, 1574 (D.S.C.1991) (court implementing *pro tanto* approach must await end of discovery to make fairness determination).

8. The individual defendants have offered to submit their financial statements for the court's review, *in camera, ex parte.* The court is not inclined to examine the statements without permitting the FDIC access. The individual defendants have not even suggested submitting the statements to the court and the FDIC under a protective order. The non-party settlors have not offered up any financial information. The burden to submit full information to the court and the non-settling defendants must lie on the parties seeking the court's approval for the settlement.

9. In *FDIC v. Geldermann, Inc.,* 975 F.2d 695 (10th Cir.1992), the court of appeals rejected a settlement agreement—in which the FDIC was the plaintiff—which would have prevented non-settling defendants from seeking indemnity or

contribution from non-parties. (The non-parties were defendants in another suit brought by the FDIC.) After an analysis much like this court's fairness analysis, the court concluded that the combination of the bar order and the *pro tanto* rule left the non-settling defendants with "nothing to win and everything to lose." *Id.* at 698. The non-settling defendant in this case, the FDIC, faces the same circumstance. Other courts have rejected any bar which would exempt non-parties. *See, e.g., Employers Ins. v. Musick, Peeler, & Garrett,* 954 F.2d 575, 579 (9th Cir.), *cert. granted,* —— U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 23 (1992) (rejecting claims bar in favor of non-parties because allowing suits against non-parties satisfies deterrence and punishment goals of federal securities laws).

10. The court has assumed the appropriateness of the *pro tanto* approach because that is the option currently before the court. The court has not considered whether, as a matter of federal common law, the *pro tanto* or the proportional fault rule must be used. Nor has the court considered the relative efficiencies of the two judgment reduction methods.

the rule of joint and several liability—plaintiffs should be able to recover from whatever wrongdoer can pay.[11] The potential injustice, however, of the *pro tanto* approach and the expansive claims bar is particularly great when the non-settling defendant is the FDIC. The court has not welcomed those of the FDIC's arguments during this motion or during its consideration of the *D'Oench* issue which amounted to little more than "we are the FDIC and we win." Nonetheless, when considering the weight to be given to the various federal policies at stake—encouraging settlements, compensating plaintiffs, deterrence under the securities laws, etc.—the court cannot ignore the federal policy in favor of making the FDIC whole. Plaintiffs' arguments that the court should compensate plaintiffs before it concerns itself with equities among defendants must be tempered when the defendant being prejudiced is the FDIC, who, in some sense, is also an innocent and who represents the beleaguered federal treasury.

Counsel for the FDIC was candid at oral argument that the FDIC advances the *pro tanto* approach when it is a plaintiff and fights it when it is a defendant.[12] *See FDIC v. Geldermann*, 763 F.Supp. 524 (W.D.Okla.1991), *rev'd* 975 F.2d 695 (10th Cir.1992) (district court approved *pro tanto* settlement agreement in which FDIC was plaintiff). In *Geldermann*, for instance, the district court enunciated its belief that the *pro tanto* approach advanced important government policies behind making the FDIC whole. These equities drop out of the equation, however, when the FDIC is the defendant; indeed, they may even cut the other way. While the court does not believe that these equities would prohibit a court from adopting a *pro tanto* approach with an expansive claims bar, they do counsel against it in this case.

## 2. *The Bar Against Indemnity Claims*

The court does not accept the FDIC's claim that a court may never enter a bar against indemnity claims or so-called "independent" claims. The distinction which the FDIC seeks to make between claims involving joint liability and claims involving duties between tortfeasors is too simplistic. Contribution claims can be "dressed up" as indemnity or "independent" claims and a court need not hesitate to bar such claims. *See South Carolina v. Stone*, 749 F.Supp. 1419, 1433 (D.S.C.1990) (barring "independent" claims because "a rose by any other name is still a rose"). Nonetheless, the court questions whether the appropriate conditions for a broad claims bar which includes indemnity claims have been met.

 There is little disagreement that contribution bars may be implemented; without them, settlement would be unlikely. To implement a contribution bar, a court must determine that the settlement was made in good faith and that the non-settlors receive an appropriate offset. Indemnity, however, does more than simply share the loss between tortfeasors who each possess a certain percentage of the fault. Rather, indemnity is an equitable principle which requires one party to pay the entire amount of damages owed by another party. *See Alvarado Partners*, 723 F.Supp. at 549. It is exactly for this reason that many courts have ruled that there can be no indemnity claims under the federal securities laws because indemnity would permit a tortfeasor to escape all liability. *See In re Atlantic Fin. Mgt. Inc. Sec. Lit.*, 718 F.Supp. 1012, 1015 (D.Mass. 1988); *Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101, 1104 (4th Cir. 1989).

 Yet this reason also suggests that the inquiry as to whether indemnity claims

---

11. Plaintiffs would only elect a proportional fault approach if they thought that they were receiving an incredibly good settlement, not commensurate with the fault of the settling party, or if, in the absence of court approval of a *pro tanto* approach, they thought it was a cost-effective deal given the potential outcome of litigation against the non-settlors.

12. The court is somewhat bothered by the government espousing contrary positions, but the federal policy in making the FDIC whole justifies these positions somewhat. In this case, the FDIC is simply arguing that the settlement is not fair.

may be barred must be somewhat more stringent than that for contribution claims. Extinguishing a right of indemnity would give a great benefit to the settling tortfeasor, who might have been liable not only for its own share of the liability, but also might have been required to reimburse other defendants. Unless the court, in its fairness inquiry, finds there are no indemnity claims, or that the only indemnity claims are in the nature of contribution, a bar against indemnity claims seems inappropriate.[13] At least one court of appeals has found that rights of indemnity cannot be extinguished. *See Donovan v. Robbins*, 752 F.2d 1170 (7th Cir.1984).

Although the court does not necessarily espouse the 7th Circuit's *per se* rule, the court is not at this time prepared to accept a blanket ban on indemnity claims. The majority of courts considering the issue have rejected indemnity in the federal securities law context, but plaintiffs are also seeking common law relief under D.C. law. Further, the parties have not briefed in detail whether the provisions of FIRREA which permit the FDIC to recover from officers and directors of failed banks would affect the federal securities' laws policy against rights of indemnity. *See* 12 U.S.C. § 1821(k). If the court is to eventually reach this issue, further argument on the effects of FIRREA will be necessary.

## V. Conclusion

For the foregoing reasons, it is hereby ORDERED that plaintiffs' and individual defendants' motion for approval of the partial settlement is DENIED.

SO ORDERED.

---

13. Alternatively, as described above, the court could find that the reality of the settling defendants' financial situation is so dire that a bar against indemnity claims would have essentially no effect.